UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| GEORGE STRUM, On Behalf of Himself and All Other Similarly Situated Shareholders of China Security & Surveillance Technology, Inc., | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) ) | |
| CHINA SECURITY & SURVEILLANCE TECHNOLOGY, INC., RIGHTMARK HOLDINGS LIMITED, RIGHTMARK MERGER SUB LIMITED, GUOSHEN TU, TERENCE YAP, RUNSEN LI, PETER MAK, and ROBERT SHIVER, | ) ) ) ) ) ) ) | **Jury Trial Demanded** |
| Defendants. | ) ) ) | |

## VERIFIED CLASS ACTION COMPLAINT

Plaintiff alleges, based upon the investigation made by and through his attorneys, the following:

## NATURE OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of himself and the other public shareholders of China Security & Surveillance Technology, Inc. ("CSST" or the "Company") who have been damaged by the violations of federal law, and breaches of fiduciary duties owed to them by the members of the CSST Board of Directors (the "Individual Defendants") identified *infra*, and by the aiding and abetting thereof  by Rightmark Holdings Limited ("Rightmark" or the "Parent") and Rightmark Merger Sub Limited ("Merger Sub") with respect to the breach of fiduciary duty claims. CSST, Individual Defendants.  Parent and Merger Sub we collectively referred to as the "Defendants."

2.      On April 21, 2011, the CSST Board of Directors (the "Board") announced that it had entered into a definitive agreement (the "Merger Agreement") with Parent, a British Virgin Islands company wholly owned indirectly by Defendant Guoshen Tu ("Tu"), under which Tu, through Merger Sub, would purchase all outstanding CSST shares he does not currently own in exchange for $6.50 in cash (the "Proposed Transaction").  According to the April 21, 2011 press release, Defendant Tu owns approximately 20.9% of the Company's outstanding shares.

3.      As described below, the Proposed Transaction is fundamentally unfair to Plaintiff and other public shareholders of the Company. The Individual Defendants' conduct constitutes a breach of their fiduciary duties owed to CSST's shareholders and a violation of applicable legal standards governing their conduct.

4.      Plaintiff alleges that Defendant Tu and the other Individual Defendants have breached their fiduciary duties to him and the other CSST common shareholders by offering a price far below the intrinsic value of CSST's shares, and seek to enjoin Defendant Tu from acquiring the shares he does not already own.

5.      The Company's recent financial success, featuring healthy revenue and net income growth, increasing operating margins and bright sales prospects demonstrates that CSST common stock is currently undervalued.  Defendant Tu is trying to take advantage of this short-term dip in the price of Company stock by offering $6.50 per share to take the Company private and using his influence with the Board to ensure that his unfair, undervalued offer is accepted. Defendant Tu's offer price is well below the target prices set by analysts and the price at which the stock has traded within the past year, and is designed to take advantage of the temporary lull in the stock price due

only to the downturn in the global economy and not because of any change in the Company's underlying strength.

6.     Since Defendant Tu is CEO and Chairman of CSST's Board and owns approximately 20.9% of CSST's outstanding shares, he dominates and controls the Board.  As a result, the Board cannot act independently and is unable to act in the best interests of CSST's public shareholders.

7.     To wit, on January 31, 2011, CSST announced that a Special Committee of the Board (the "Special Committee") had been established to consider Defendant Tu's proposal.  The Special Committee is comprised of the Company's three purportedly "independent directors".  Since its formation, however, the Special Committee has not indicated whether it has investigated other possible deals that would offer a fair value to shareholders or, for that matter, the possibility of maintaining the Company as a stand-alone entity.  There is no evidence that an active market check or open auction for sale of the Company has been undertaken by the Special Committee, or that it has engaged in fair and open negotiations with all potential bidders.

8.     In connection with the Proposed Transaction, the company filed a materially false and misleading preliminary proxy statement (the "Preliminary Proxy") with the United States Securities & Exchange Commission (the "SEC") on July 8, 2011 outlining the Proposed Transaction and its background.  As alleged herein, the Preliminary Proxy fails to disclose to CSST shareholders material information regarding the Proposed Transaction, stripping such shareholders of their ability to render informed decisions as to whether to tender their shares.

9.     Plaintiff seeks to enjoin Defendants from completing the Proposed

Transaction or, in the event the Proposed Transaction is indeed consummated, to recover damages resulting from the Defendants' wrongful conduct.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Section 14(e) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78n(e).   This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C.  § 78aa and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because defendant CSST has its principal place of business in this District.   Plaintiff's claims arose in this District, where most of the actionable conduct took place, where most of the documents are electronically stored and where the evidence exists and where virtually all the witnesses are located and available to testify at the jury trial permitted on these claims in this Court.   Moreover, each of the Individual Defendants, as Company officers and/or directors, has extensive contacts with this District.

## THE PARTIES

12.     Plaintiff George Strum is, and was at all times relevant hereto, a shareholder of CSST.

13.     Defendant CSST is a corporation organized and existing under the laws of the State of Delaware and headquartered in Shenzhen, China.   CSST manufactures, distributes, installs and services security and surveillance products and systems as well as develops security and surveillance related software in China.   The Company maintains its headquarters at 1 3/F Special Zone Press Tower, Shennan Road, Futian District,

Shenzhen, People's Republic of China.  The Company's common stock trades under the ticker symbol "CSR" on the New York Stock Exchange.

14.     Defendant Rightmark is a British Virgin Islands corporation and wholly owned subsidiary of Intelligent One Limited, a British Virgin Islands company wholly owned by Defendant Tu.

15.     Defendant Merger Sub is a Delaware corporation and a wholly owned subsidiary of Parent, formed for purposes of the Proposed Transaction.  Under the terms of the Merger Agreement, Merger Sub will be merged with and into the Company (the "Merger"), with the Company surviving the Merger as a wholly owned subsidiary of Parent.

16.     Defendant Tu has served as CSST's CEO and Chairman since September 2005.  Defendant Tu owns 18,750,435 shares of CSST's common stock, or approximately 20.9% of the Company's outstanding shares.  Based upon his extensive holdings and service as Chairman of the Board and CEO, Defendant Tu, in effect, controls the Company.

17.     Defendant Terence Yap ("Yap") has served as the Company's Chief Financial Officer since January 2007 and as a director and Vice Chairman since March 2006.

18.     Defendant Runsen Li ("Li") has served as a director of CSST since August 2007, is the Chairman of the Board's Nominating and Governance Committee and is a member of both the Board's Compensation Committee and Audit Committee.

19.     Defendant Peter Mak ("Mak") has served as a director of CSST since October 2007, is the Chairman of the Board's Audit Committee and is a member of

both the Board's Compensation Committee and Nominating and Governance Committee

20.     Defendant Robert Shiver ("Shiver") has served as a CSST director since October 2007, is the Chairman of the Board's Compensation Committee and is a member of both the Board's Audit Committee and Nominating and Governance Committee.

21.     As a "Public Company" within the meaning of the federal securities laws, CSST is bound by the Security Exchange Act of 1934 (the "Exchange Act") and its reporting requirements.

22.     As directors and officers of CSST, the Individual Defendants identified in paragraphs 16 through 19 owe fiduciary duties to CSST and its shareholders and were and are required to act in furtherance of the best interests of CSST shareholders, to maximize shareholder value in any sale of the Company, to refrain from benefiting from information to which they are privy only by virtue of their positions, and to refrain from exerting undue influence over decisions of the Board or otherwise taking advantage of their positions of power and control within the Company.  Moreover, the Individual Defendants, because of their positions of control and authority as participants, officers and/or directors of the Company, were able to and did, directly or indirectly, control the actions of the Company in connection with the disclosure violations set forth herein, or participated in the preparation, approval and filing of CSST's materially misleading Preliminary Proxy and its dissemination.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action on behalf of himself and all other shareholders of CSST who are, or will be, threatened with injury arising from Defendants' actions (the

"Class").  The Class excludes Defendants, and any person, firm, trust, corporation or other entity related to, affiliated with, or controlled by any of the Defendants, as well as the immediate families of the Defendants.

24.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.   As of May 27, 2011, the total number of issued and outstanding CSST shares was 89,722,023.   Members of the Class are geographically dispersed throughout the United States and are so numerous that it is impracticable to bring them all before this Court.

(b)     Plaintiff is committed to prosecuting this action and has retained competent counsel, experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class.  Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

(c)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for defendants, or adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impede their ability to protect their interests.

(d)     To the extent Defendants take further steps to effectuate the

proposed transaction, preliminary and final injunctive relief on behalf of the Class as a whole will be entirely appropriate because Defendants have acted, or refused to act, on grounds generally applicable to the Class.

25.     Questions of law and fact exist that are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

(a)     Whether Defendants participated in and/or pursued the course of conduct complained of herein by filing and publishing documents with the SEC containing statements that, at the time and under the circumstances which they were made, omitted to state material facts necessary in order to make the statements therein not false or misleading;

(b)     Whether the Defendants acted knowingly or recklessly in disseminating documents which omitted to disclose material facts concerning the Proposed Transaction;

(c)     Whether Defendant Tu and the other Individual Defendants have breached their fiduciary duties owed to Plaintiff and the Class, including but not limited to, the duties of undivided loyalty, independence, due care, honesty and good faith;

(d)     Whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of Plaintiff and the Class;

(e)     Whether Plaintiff and the other members of the Class will be irreparably damaged if Defendants are not enjoined from continuing the conduct described herein, or alternatively, if the Proposed Transaction is

consummated, whether they have suffered compensable damages;

(f)     Whether the consideration payable to Plaintiff and the Class for their CSST shares  pursuant to the Proposed Transaction is unfair and inadequate;

(g)     Whether Defendant Tu and/or the other Individual Defendants are engaged in self-dealing  or unjustly enriching themselves at the expense of Plaintiff and other Class members in connection with the Proposed Transaction; and

(h)     Whether Parent and Merger Sub aided and abetted the Individual Defendants' breaches of fiduciary duties of candor, due care, good faith, and loyalty with respect to Plaintiff and the Class as a result of the conduct alleged herein.

## SUBSTANTIVE ALLEGATIONS

### Company Background

26.     CSST is currently incorporated in Delaware and headquartered in Shenzhen, China.  The Company was originally incorporated in the British Virgin Islands as "Apex Wealth Enterprises Limited" in April 2002.  In November 2006 the Company merged into a newly incorporated Delaware corporation, China Security & Surveillance Technology, Inc., at which point its domicile changed to Delaware.

27.     CSST primarily operates and generates revenue through a series of Chinese subsidiaries.  The Company's Chinese subsidiaries collectively have more than 150 branch offices and distribution points and approximately 3,500 full-time employees.

28.     The Company is engaged in, and most of its revenues generated from,

the manufacture, distribution, installation and after-sale servicing of surveillance and safety systems and products, as well as the development of surveillance and safety related software primarily for Chinese governmental entities and their affiliates (such as municipalities, cities, provinces, customs agencies, courts, public security bureaus, and prisons), non-profit organizations (including schools, museums, sports arenas, and libraries), and commercial entities (such as airports, hotels, real estate, banks, mines, railways, supermarkets, and entertainment venues).

29.     CSST has enjoyed consistent, substantial growth and its fiscal outlook is strong.  On July 26, 2010, CSST released its financial results for the second quarter 2010, for the period ending June 30, 2010.  In the Company's press release announcing the results, captioned "Significant Revenue and Net Income Growth, Robust Margin Expansion," Defendant Tu touted the Company's current success:

> Revenues and earnings growth continue to be solid, our margin improvement is encouraging, major growth and cost initiatives are on track, and we continue to execute on large-scale government projects from safe cities and e-cities in China.
>
> CSST has taken the lead in deploying and enhancing our industry-leading products and solutions for government and corporate customers, which are further complemented by our expansion in the Security Service business.

30.     In the July 26, 2010 press release, Defendant Tu also commented on the Company's bright prospects, stating he was "very confident of [CSST's] ability to deliver strong results in 2010," citing "terrific industry demand for surveillance and safety products and services in China, … meaningful and sustainable competitive advantages for [CSST] to capitalize on in the years ahead, [and] high-growth initiatives."

31.     The financial results reported by the Company in the July 26, 2010

earnings release reinforced Defendant Tu's positive statements.   They included the following:

- Revenues of $168,354,000 versus $141,915,000 for the second quarter 2009, a 18.6% increase;

- Net income attributable to the Company of $17,803,000 versus $6,501,000 for the second quarter 2009, a 174% increase;

- Gross margins of 25.8% compared to 21.9%  for the second quarter 2009;

- Operating margins of 14.6% compared to 8.9% in the second quarter 2009;

- Gross profit of $43.36 million, up 39.8% from $31.02 million in the second quarter 2009;

- Income from operations of $24.56 million versus $12.57 million for the second quarter 2009, a "significant" increase of 95.4%.

32.   The Company's growth continued to accelerate with the Company's announcement on August 11, 2010 that it signed a new two year $100 million contract with the government of Huainan City, Anhui Province, China.  In addition to this contract, CSST stated it may provide further support for the construction of an environment protection and pollution control system in Huainan City, a water conservation and rehabilitation system, a public safety and fire safety system, an energy saving and emission reduction system, and an emergency control system.

33.   In announcing CSST's contract with the government of Huainan City, Defendant Tu stated that "[O]ur fundamentals are strong," and the contract was another "positive sign of growth," which was a "testament to CSST's capabilities in large-scale government projects."  Defendant Tu added that "most of [the government projects] are on track to completion, which speaks to the quality of our execution and effective project

management."

34.     On October 26, 2010, CSST released its financial results for the third quarter

2010, for the period ending September 30, 2010.  In the Company's press release announcing

the results, captioned "Strong Momentum in the Installation Segment, Robust Expansion in

Margins," Defendant Tu again touted the Company's impressive performance:

> [W]e delivered another strong quarter, with improved revenue trends,
> continued double-digit earnings growth and significant margin expansion.
> These results add to our confidence in the future.
>
> We continue to see positive signs of growth in large-scale government
> contracts, which speaks to our unparalleled one-stop solutions and our
> leadership in this area. Our service business also continues to garner
> favorable response from the customers. I am excited by the opportunities
> ahead.

37.     Moreover, Defendant Tu continued to be extremely positive about

CSST's future prospects.  In raising the Company's 2010 revenue projection from

$730 million to $750 million, he stated: "[A]s a result of the strong momentum in

higher margin large scale government contracts in China, the Company anticipates

that these projects will take a longer time to complete, hence impacting the revenue

trends in the fiscal year of 2010."

35.     Defendant Tu also discussed the Company's "strong backlog and

improved margins driven by installation projects in the government sector" in

projecting 2011 revenue "in the range of $870 million to $890 million."  He added

that the importance of surveillance and safety solutions to corporate and government

bodies in China have generated "unprecedented opportunities for CSST to reap

returns on ["CSST's] investments."

36.     The results reported by the Company in the October 26, 2010 press release

again confirmed that Defendant Tu's positive sentiments were justified.  They included the following:

- Revenues of $182,148,000 versus $159,820,000 for the third quarter 2009, a 14% increase;

- Net income attributable to the Company of $27,268,000 versus $21,972,000 for the third quarter 2009, a 24% increase;

- Gross margins of 30.7% compared to 22.1% for the third quarter 2009, a "record high";

- Operating margins of 19.3% compared to 10.8% in the third quarter 2009;

- Gross profit of $55.93 million, up 58.3% from $35.34 million in the third quarter 2009;

- Income from operations increased to $35.22 million versus $17.21 million for the third quarter 2009, a "significant" increase of 104.6%;

- Backlog of sales contracts of $412.56 million, up from $213.12 million for the third quarter 2010.

37.     In the October 26, 2010 conference call with investors following the third quarter 2010 earnings release, a Company investor relations representative stated that CSST was seeing continuing "steady improvement in the business in both revenue growth and margins expansion," "good traction in the corporate and government sector," and "positive revenue trends."

38.     Defendant Yap, CSST's CFO, underscored the robust outlook for the future by noting, during the October 26, 2010 conference call, a "continuing growth in demand for our one-stop shop solutions and services in China," a "healthy capital structure" and cash position that allows the Company to "actively pursue more projects," and touted the Company's $412 million backlog.  In response to a question from an investor regarding prospects for continued Chinese government spending, Defendant

Yap stated:

> "[W]e continue to see strong growth…[s]o the growth industry in China especially for social harmony and social stability is not going away anytime soon.  We are going to have a huge security trade show in Beijing next week, which highlights the continuous growth in the industry, especially in China.  So from our perspective we have not seen a slowdown in the government sector."

41.     Defendant Yap further summarized CSST's prospects as follows:

> When we look at our business and we look at opportunities ahead, we believe there are number of things that set CSST apart in this industry.  First, we're well positioned to capture the next wave of growth in the safety and surveillance industry in China.  The demand for safety and surveillance solutions for corporate and government customers continues to surface.  We have a strong installation business that is setting the pace in terms of revenue growth and expenses.  We delivered a strong growth in margins year-over-year with several margin expansion opportunities ahead.  Most importantly, we're an eminent leader in offering a full suite of solutions and services.  We are gradually establishing ourselves as a player to be reckoned with within the service business, the main growth area for us. We also have tremendous opportunity as we continue to capitalize on existing customers on the Installation business for the growth in this new segment. We are seeing encouraging response from [inaudible] and we are rapidly putting resources in this regard.  We've also made meaningful improvements on the cost side of our business with continuing cost improvement opportunity at both the gross margins and improving financial position. We continue to integrate our business and achieve cost efficiencies across our various subsidiaries moreover with the anticipated consolidation of our [inaudible] service business. We remain upbeat about our growth potential in the years ahead.  So we have a positive long-term outlook for the business.

39.     On February 28, 2011, CSST released its fourth quarter and 2010 year-end financial results.  In the Company's press release announcing the results, again captioned "Strong Momentum in the Installation Segment, Robust Expansion in Margins," Defendant Tu praised the Company's impressive performance.  Defendant Tu stated "we had another strong quarter and a solid year.  Our major growth drivers – large-scale government projects and security service business – continue to set the pace for the industry, and

we're still early in the growth cycle of these areas."

40. The reported results demonstrate the continued strength of CSST's financial condition. For the fourth quarter 2010, they included the following:

- Revenues of $214,011,000 versus $182,719,000 for the fourth quarter 2009;

- Net income attributable to the Company of $29,040,000 versus $26,058,000 for fourth quarter 2009, an 11.4% increase;

- Gross margins of 28.6% compared to 28.2% for the fourth quarter 2009;

- Gross profit of $61.15 million, up 18.8% from $51.48 million for the fourth quarter 2009;

- Income from operations of $37,206,000 versus $28,201,000 for the fourth quarter 2009.

41. The results reported for full year 2010 were equally impressive:

- 2010 revenues of $684,70,000 versus $580,870,000 for the full year 2009, a 17.9 % increase;

- 2010 net income attributable to the Company of $77,389,000 versus $56,577,000 for full year 2009;

- 2010 gross margins of 27.7% compared to 24.6%  for  full year 2009;

- 2010 operating margin increase to 15.2%;

- 2010 gross profit of $189.42 million, a 36.6% increase from $142.87 million for full year 2009;

- 2010 income from operations totaled $103,941,000, a 57.6% from $65,961,000 for full year 2009;

- As of December 31, 2010, a backlog of sales contracts of $325.50 million.

42. Regarding the Company's outlook for 2011, Defendant Tu stated in the February 28, 2011 press release that "[p]rogress across these growth drivers, combined

with continued progress on our cost improvement initiatives, makes us feel confident of our outlook." Defendant Tu further stated:

> We aim to take our business to the next level in 2011.
> We're seeing continuing growth in industry demand in China. We have built and scaled solid growth platforms for the future. Our installation business is positioned for growth from future wins of large-scale government contracts and we also expect growth in our service business. CSST has led the surveillance and safety industry in China and we are well positioned to drive the industry's next waves of innovation and growth.

43.     In short, CSST has experienced success and its prospects were so promising that, according to the Company's 10-K for fiscal and calendar year 2010 filed with the SEC on February 28, 2011 ("2010 10-K"), the Company had a backlog of unfilled orders for products and services of $325.50 million, $192.85 million and $88.54 million, respectively as of December 31, 2010, 2009 and 2008.

## **Proposed Transaction Background**

44.     On January 28, 2011, CSST issued a press release announcing that the Board had received a non-binding letter from Defendant Tu in which he stated that he was considering the feasibility of developing a proposal to acquire all of the outstanding shares of common stock of CSST he did not currently own in a "going private" transaction. Defendant Tu stated in the letter that although "the amount of the purchase price has not been determined, [] my firm expectation is that it will not exceed $6.50 per share." The January 28, 2011 press release went on to state that the Board intended to form a special committee of independent directors to consider Defendant Tu's "interest and any proposal made by him."

45.     On January 31, 2011, CSST issued a press release announcing that on January 28, 2011, it had established the Special Committee to consider the proposal

received by Defendant Tu.  The Company stated that the Special Committee is composed of three "independent" members of the Board: Defendants Mak, Li and Shiver.  The Company also stated that the Special Committee was directed to consider Defendant Tu's interest and any proposal made by him, and that the Special Committee would retain independent legal and financial advisors to assist it.  Defendants Mak, Li and Shiver were compensated handsomely for their participation on the Special Committee.

46.     On February 22, 2011, CSST issued another press release announcing that the Special Committee had retained Nomura International (Hong Kong) Limited ("Nomura") as its financial advisor and Shearman & Sterling LLP as its legal advisor "to assist the Special Committee in its work."  The February 22, 2011 press release added that "[n]o assurance can be given that any definitive offer will be made, that any agreement will be executed or that a transaction with Mr. Tu or any other transaction will be approved or consummated.  The Company does not intend to disclose developments regarding these matters unless and until its Board of Directors determines there is a need to update the market."

47.     On February 28, 2011 the Company filed its 2010 10-K with the SEC, which outlined its past success and strong fiscal prospects, as well as Defendant Tu's comments on the same, described *supra*.

**Defendant Tu's Proposal Letter**

48.     On March 8, 2011, the Company issued a press release announcing that it had received a "non-binding proposal letter from Defendant Tu to acquire all of the outstanding shares of the Company's common stock not currently owned by him, certain members of the management and their affiliated entities, in a going private

17

transaction for $6.50 per share in cash." Although Defendant Tu's price was a 58%

premium to the previous closing price, it represented a discount to where the stock had

traded just months earlier and was barely half of the price levels targeted by analysts.

As disclosed in the Company's March 8, 2011 press release, the "going private" letter

states, in part, as follows:

> Dear Sirs:
> On January 28, 2011, I requested the opportunity to receive information and otherwise work further in order to develop a proposal (the "Proposal") to acquire the stock of China Security & Surveillance Technology, Inc. (the "Company") that I do not already own in a going-private transaction (the "Acquisition"). My advisors and I have done a substantial amount of preparatory work at this point. In addition, I have conducted detailed discussions with sources of debt financing. Based on these efforts, I am quite confident (although no assurances can be given) that the Acquisition can be financed consistent with current transaction terms and on an expedited timetable.

> I thank you for providing me this opportunity, and at this time I would like to make this nonbinding Proposal to the Board:

>  1. Purchase Price. The purchase consideration to public stockholders (other than myself, certain members of the management and affiliated entities, who would continue to hold equity) would be the amount of US$6.50 per share in cash, which represents a premium of 58.5% to the Company's closing price on March 7, 2011. I strongly believe that the Company's public stockholders will find this price to be very attractive, and one they will readily support.

>  2. Financing. The Acquisition would be financed with a combination of debt and equity capital.

>> a. *Debt Financing*. I have held preliminary discussions with potential sources of debt financing. Based on these discussions, as well as current market conditions, I am confident the debt financing necessary for the Acquisition can be arranged on a timely basis.

>> b. *Equity Financing*. I am prepared to provide all the necessary equity financing out of my own holdings of common stock and related sources. As the transaction develops, it might prove sensible for some of the equity financing to come from an independent source such as leading private equity firms active

in Asia, but I emphasize that no additional sources of equity financing are necessary to the transaction.

It remains the case that there are no arrangements or understandings with potential sources of debt or equity financing for the Acquisition, and I do not propose to make any agreement of exclusivity prior to reaching transaction terms approved by the Board of Directors.

3. Timing and Next Steps. If the Board considers this Proposal and finds that it is worth pursuing, I am prepared to proceed immediately to arrange firm, committed financing, finalize the terms of the Acquisition in the form of definitive transaction documents, and seek the Board's determination as to the acceptability of a definitive, binding Acquisition agreement and related documents. I fully expect that the process of developing an acceptable Proposal can be conducted expeditiously and completed within [four] weeks with the cooperation of the Board and the Company.

49.    As excerpted above, the March 8, 2011 proposal letter also states that Defendant Tu is in the process of arranging the for the "debt and equity capital" that will be used to finance the Proposed Transaction.  Although Defendant Tu maintained that no financing arrangements were in place at the time, the letter indicated that "certain members of management and affiliated entities" would contribute necessary financing. Three days later, Nomura discussed with the Special Committee the unidentified participation of Company management in the Proposed Transaction.

### *Background of Sham Auction Process Leading to the Offer and the Merger*

50.    On or about July 8, 2011, the Individual Defendants filed the Preliminary Proxy statement on Schedule 14A (together with any exhibits, amendments or supplements thereto, the "14A") reporting that they determined that the Proposed Transaction was in the best interests of the Company and its shareholders and recommending that its shareholders vote for the proposal to adopt the Merger Agreement.  Included in the 14A was a section detailing the background of the merger

which stated, among other things, that in the week of November 22, 2010, Defendant Tu informed the Board of his potential interest in purchasing those CSST shares he did not currently own in a "going private" transaction, an interest subsequently memorialized in Defendant Tu's January 28, 2011 letter to the Board.

51.     The Preliminary Proxy identifies, in addition to Defendant Tu, eighteen Company members (the "Rollover Stockholders"), including Defendant Yap, as participants in the Proposed Transaction.

52.     It is reasonable to infer, in light of the number of Company participants as disclosed in the Preliminary Proxy, that Defendant Tu discussed with at least some of the managers the details of participating in the Proposed Transaction in the time leading up to Defendant Tu's proposal letter dated March 8, 2011.  However, the Preliminary Proxy makes no mention of the details or timing of any such discussion between Defendant Tu and members of management.

53.     In the period preceding the March 8, 2011 proposal letter, the Special Committee met with advisor's regarding Tu's previous indication of interest, but the Preliminary Proxy fails to disclose whether the Special Committee considered the Company remaining a stand-alone entity.  Instead, the Preliminary Proxy makes clear that Tu's acquisition of the Company was to proceed without impediment by the Special Committee

54.     Despite noting that other potential acquirers "may be less enthusiastic about pursuing any potential transaction with the Company without the active participation of Mr. Tu," Nomura nonetheless attempted to pursue other offers by delivering "bid invitation" letters to four potential strategic buyers and 12 potential

financial buyers.  These solicitation letters were sent on or about April 8, 2011, with a response deadline of April 15, 2011, at 5:00 P.M. Hong Kong time, just seven days later. Thus, any potentially interested party was given one week to complete the due diligence necessary to formulate a responsible offer, despite not having unfettered access to CSST's sensitive financial information that Defendant Tu, as SST's CEO, was privileged to.

56.     When the April 15, 2011 deadline for bids had passed, the Special Committee held a meeting at which Nomura notified the Special Committee that none of the potential buyers had delivered an offer.

56.     In the same April 15, 2011 meeting, Nomura informed the Special Committee that it had several discussions with Bank of America Merrill Lynch, Defendant Tu's financial advisor, in an effort to induce a higher price from Defendant Tu.  The Preliminary Proxy disclosed simply that, "Mr. Tu was not willing to increase the offer price."  The Preliminary Proxy gives no details as to the Special Committee's efforts to garner a higher offer from Defendant Tu.

57.     Although Defendant Tu was unwilling to increase his offer and lacked ascertained financing at that point, the Special Committee continued to negotiate the open terms of the transaction documents.  The Special Committee did not, so far as the Preliminary Proxy discloses, ever consider maintaining the Company as a stand-alone entity or, at the very least, levering its negotiations with Defendant Tu through the possibility of withdrawing from discussions with Defendant Tu, despite a transaction price, at $6.50 per share, which was unfair to Plaintiff and the Class.

58.     Between April 17, 2011 and April 20, 2011, Nomura indicated that it

might be unable to render within the coming days an opinion as to the fairness of Defendant Tu's offer.   Defendant Tu, in response, formally informed the Special Committee that if they felt comfortable moving ahead with the Proposed Transaction, he was prepared to consummate the transaction even without Nomura's fairness opinion. On April 22, 2011, Nomura resigned as financial advisor, and advised the Special Committee that any advice or documents provided earlier by Nomura should not be relied upon by the Special Committee.

59.     On April 20, 2011, despite not having received a fairness opinion letter from Nomura or any other financial advisor, and amidst Nomura's impending resignation, the Board, based upon the unanimous recommendation of the Special Committee, unanimously approved and declared advisable the Merger Agreement. Despite having been warned by Nomura at the time of its resignation not to rely on any advice or documents Nomura provided, the Preliminary Proxy cites the "preliminary financial analysis and information received from Nomura during its engagement" as among the factors the Special Committee and the Board relied upon in approving the Merger Agreement.   The next day, CSST issued a press release announcing the Merger Agreement.   Nomura's compensation package was never disclosed by the Preliminary Proxy.

60.     On April 22, 2011, the same day as Nomura's resignation, the Special Committee retained Imperial Capital, LLC ("Imperial Capital"), for an abundant fee, to render a fairness opinion in connection with the Proposed Transaction.   Such an opinion would act as a rubber stamp for the Proposed Transaction, as it were, given that the Board had already unanimously approved of the merger.

61.   Imperial Capital ultimately rendered its fairness opinion, in favor of the transaction, on May 3, 2011, a single day before the deadline passed for the Special Committee to unilaterally terminate the Merger Agreement.

62.   On May 3, 2011, the parties adopted an Amended and Restated Agreement and Plan of Merger (the "Amended Merger Agreement") which differed slightly from the original Merger Agreement.   Among several changes, the Amended Merger Agreement: (i) extended the "No-Shop" provision from 40 days to 60 days; and (ii) instituted a "majority of the minority" voting requirement, ostensibly for the benefit of unaffiliated stockholders.   As discussed, *infra*, these revisions do little to mitigate the coercive nature of the Proposed Transaction.

### Background of the Merger Section of the Preliminary Proxy Fails to Disclose April 19, 2011 Price Indication by Anonymous Bidder

63.   The subsection *"Other Analyses"* in the *"Summary of Financial Analyses"* section of the Preliminary Proxy states that Imperial Capital, in arriving at its fairness opinion, also considered, "a price indication received on April 19, 2011 by another potential bidder that implied a price per share of Company common stock of approximately $5.68 to $6.24."   This is extremely troublesome considering that there are no details concerning this indication of interest in the *"Background of the Merger"* section.   Furthermore, there is no disclosure of whether this bidder was one of the strategic or financial buyers who received bid invitation letters on April 8, 2011.   The lack of information regarding this bidder's indication of interest and the apparent lack of any steps taken by the Special Committee in evaluating this bid call into question whether shareholders are receiving the necessary material background information regarding all of the bids received by CSST.   Without this information shareholders

cannot make a fully informed decision on whether to vote for or against approval of the Proposed Transaction.

<u>**Misleading Nature of the Preliminary Proxy Statement**</u>

64.     The Preliminary Proxy filed by the Company with the SEC, in violation of the federal securities laws, is materially misleading due to numerous omissions of information necessary for Plaintiff and the Class to make informed decisions as to whether to vote their shares in favor of the Proposed Transaction.  These omissions include:

(a)     The nature and status of the SEC's ongoing investigation of the Company which is referenced in the Preliminary Proxy, as well details of its impact, if any, on interest exhibited by other potential bidders;

(b)     Details as to efforts made by or on behalf of the Special Committee to induce a higher bid from Defendant Tu;

(c)     Information as to whether the Special Committee considered maintaining the Company as a stand-alone entity and details, if any, as to leveraging tactics used by the Special Committee in its negotiations with Defendant Tu and Parent;

(d)     Details pertaining to the timing and nature of discussions between Defendant Tu and the Rollover Stockholders regarding their potential participation in the Proposed Transaction;

(e)     The compensation package Nomura was to be paid for its services in connection with the Proposed Transaction and, in particular, for issuing a fairness opinion letter;

(f)     Background and details surrounding Nomura's indication that it was either unable or unwilling to issue a fairness opinion letter and details surrounding Nomura's subsequent resignation; and

(g)     Details of the financial analysis, advice and documents provided by Nomura to the Special Committee while it was still engaged as the Special Committee's financial advisor in connection with the Proposed Transaction.

(h)     Details regarding Imperial Capital's assumptions in its various financial analyses, critical to CSST's shareholders in making an informed decision on whether to vote for approval of the Proposed Transaction. Specifically, the decision to calculate the terminal value for CSST based on multiples of selected companies for the year 2015.

(i)     Details regarding the price indication received on April 19, 2011 by another potential bidder.

## Unfair Nature of the Transaction

65.     As described in paragraphs 29 through 43, the Company has enjoyed consistent, remarkable growth, and its financial outlook going forward is strong, as evidenced by public comments made by Defendants Tu and Yap.  The per share merger consideration of $6.50 per share, as offered by Defendant Tu, falls far below the intrinsic value of the Company, and will deprive CSST shareholders of the true value of their investments should the Proposed Transaction be completed.

66.     Defendant Tu has been CSST's CEO since 2005. As such, he has knowledge of and access to material information relating to the true value of the Company's assets and value.  Defendant Tu has an edge in any transaction in which he

proposes to purchase the public shares of the Company by virtue of his access to, and knowledge of, CSST's non-public information.  In addition, because the other Individual Defendants are beholden to Defendant Tu and/or are conflicted, they cannot be expected to review the Proposed Transaction fairly.  Accordingly, this Court must review any transaction concerning Defendant Tu with enhanced scrutiny.

67.   Although, as the March 8 proposal letter states that, "$6.50 per share represents a 58% premium to the Company's closing price [of $4.10] on March 7, 2011," the Company's stock has regularly traded at over $8.00 per share during the year prior to the announcement of the Proposed Transaction.

68.   The valuation of analysts covering the Company confirms that Defendant Tu's offer is unfair to shareholders.  On April 23, 2010, with CSST stock then trading at $7.44 per share, an analyst for Imperial Capital wrote in a research report, "we value CSST shares in a range of $11- 13 per share, with a midpoint of $12 per share. Our valuation is based on a discount to our estimated three- to five-year earnings growth rate of 15%. We had previously established a valuation range of $10-14."

69.   Moreover, only a month before the Merger Agreement was announced, a BNP Paribas Securities (Asia) analyst set a target price of $8.60 per CSST share.

70.   On June 4, 2010, Oppenheimer & Co. upgraded the Company stock from a "perform" rating to "outperform."

71.   Since CSST has continued to release superior financial results and has excellent prospects for continued growth and success, the Proposed Transaction price of $6.50 per share represents a small and insufficient premium to the Company's

temporarily undervalued stock price, and a significant discount to analyst targets and prior trading prices. Defendant Tu's offer to purchase all outstanding shares that he does not currently own for $6.50 per share is an attempt to take advantage of the downturn in the market that catches the Company at a low point. Defendant Tu is further using his influence with the Board to ensure that his unfair, undervalued offer is accepted.

72.     The Proposed Transaction is being pursued to enable Defendant Tu to acquire 100% equity ownership of the Company for his own benefit, at the expense of the Company's public shareholders, who will be deprived of their equity investment and the benefits thereof including, among other things, the Company's future financial prospects. By failing to consider any sale or merger of China CSST, selling his shares to any third party, or entering into discussions with any other financial sponsor for a similar transaction, Defendant Tu is preventing shareholders from receiving the highest price possible for their shares. Defendant Tu has timed his Proposed Transaction to place an artificial cap on the trading price of the Company's stock at a time when it is poised for significant growth due to its expected expansion plans, recent acquisitions, and new contracts.

73.     Although CSST announced that the Special Committee, allegedly "composed of three independent directors" would consider the proposal, the Board is under the domination and control of Defendant Tu and it cannot act independently and advocate the best interests of CSST's public shareholders. Defendant Tu, with beneficial ownership of approximately 20.9% of CSST's common stock and unidentified management allies and other affiliates, has the ability to block any third party bidder.

74.     The independence of the Individual Defendants other than Defendant Tu is in serious doubt since said Board members are indebted to Defendant Tu for their positions on the Board because of his ownership of approximately 20% of the Company and his presence as Chairman of the Board.  As such, Defendant Tu is in a position to dominate and control the other directors. Moreover, the Special Committee members, Defendants Mak, Li and Shiver, have potential conflicts that are troubling.  Defendants Mak and Shiver are both in the private equity business, focusing on investments in China and/or security companies.  There is the possibility that Defendant Tu, backed by private equity investors, will generate an instant windfall by immediately selling the Company's shares he acquires through the Proposed Transaction in an IPO in China.

75.     The independence of Individual Defendants Li, Mak and Shiver is also uncertain because all three are unusually highly compensated for independent directors. For example, in 2008 Defendant Li received total compensation from CSST in the amount of $450,989, Defendant Mak received total compensation from the Company in the amount of $502,138, and Defendant Shiver received total compensation of $430,638.  Moreover, for 2009 each received over $200,000 total compensation from CSST.   These are extraordinary payments to independent directors for a near micro-cap company. Compensation on this scale clearly calls into question the ability of the purportedly "independent" directors to act in the best interest of Class members and to resist the influence of Defendant Tu.

76.     Unless the Proposed Transaction is preliminarily enjoined until such time as the Individual Defendants act in accordance with their fiduciary duties to maximize shareholder value, Plaintiff and the other members of the class will be harmed and will

lose the opportunity to receive full value for their shares.

77.     The Proposed Transaction is wrongful, unfair, and harmful to Plaintiff and CSST's public stockholders who are members of the Class, and represents an attempt by Defendant Tu and the other Individual Defendants' to aggrandize their personal and financial positions and interests at the expense of, and to the detriment of, Class members.

78.     Moreover, the inherent unfairness of the Proposed Transaction is highlighted by the seeming lack of concerted efforts on the part of the Special Committee to induce a higher offer from Defendant Tu or to meaningfully solicit other potential offers, not to mention the Special Committee's ignoring the possibility of maintaining the Company as a stand-alone entity.

79.     Plaintiff and the Class will be deprived of their right to be remunerated equitably and proportionally for their investments in CSST's valuable and growing business, and Defendants Tu and Yap will profit unfairly at the expense of shareholders if the Proposed Transaction is not enjoined.

<u>**Coercive Nature of the Proposed Transaction**</u>

80.     Lastly, together with all of the coercive and deal protection devices enumerated above, the Merger Agreement contains a "No-Solicitation" provision that prohibits the Company from soliciting other offers and further severely limits the continuation of communication with potential buyers solicited during the "Go-Shop" period.

81.     Moreover, approval of the Proposed Transaction is a near-certainty, given that Defendant Tu beneficially owns approximately 20.9% of CSST shares and, together with the Rollover Stockholders, control 24.2% of outstanding Company stock.

82.     The Merger Agreement also imposes a $10 million "Termination Fee" on CSST shareholders.  This amount further makes any competing transaction that much more expensive to any potential acquirer.  Additionally, even if the Company terminates the Merger Agreement in favor of a "Superior Proposal" received during the "Go-Shop" period, it would still be obligated to pay a $5 million termination fee to Parent, Defendant Tu's wholly owned entity.

83.     That the Merger Agreement is heavily skewed in Defendant Tu's interest is demonstrated by the March 18, 2011 comments made by Nomura, which itself declined to issue a fairness opinion and resigned, as to the viability of securing other offers.  As noted in the Preliminary Proxy, "Nomura discussed the possibility that financial sponsors may be less than enthusiastic about pursuing any potential transaction with the Company without the active participation of Mr. Tu."  Once it received Defendant Tu's offer, the Special Committee's actions and inactions illustrate that, despite words to the contrary, Defendant Tu's acquisition of the Company was inevitable.

## COUNT I

### Violation of Exchange Act § 14(e)
### Against the Individual Defendants and CSST

84.     Plaintiff incorporates by reference the prior allegations set forth above as if fully set forth herein.

85.     Individually and in concert, the Individual Defendants have engaged in a

course of conduct pursuant to which representations they made by means of the 14A containing statements that, in violation of Section 14(e) of the Exchange Act, at the time and in the circumstances under which they were made, omitted to state material facts necessary in order to make the statements therein not false or misleading.

86.     By reason of the foregoing, the Individual Defendants and CSST have violated Section 14(e) of the Exchange Act.

87.     The Individual Defendants' and CSST's conduct has injured and will injure Plaintiff and the other shareholders of CSST, for which they have no adequate remedy at law.

## COUNT II

### Violations of § 20(a) of the Exchange Act
### Against the Individual Defendants

88.     Plaintiff incorporates by reference the prior allegations set forth above as if fully set forth herein.

89.     The Individual Defendants were each controlling persons of the Company within the meaning of § 20(a) of the Exchange Act.  Specifically, each of the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct complained of herein by reason of the fact that, as directors and/or officers of the Company, each participated in the day-to-day affairs of the Company in connection with the events leading to the Proposed Transaction and the subsequent filing of the 14A, in violation of Section 14(e) of the Exchange Act.

90.     As controlling persons of CSST, the Individual Defendants are jointly and severally liable to Plaintiff and the Class for the violations complained of herein.

## COUNT III

**Breach of Fiduciary Duties**
**Against the Individual Defendants**

91.     Plaintiff incorporates by reference the prior allegations set forth above as if fully set forth herein.

92.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in CSST.  Plaintiff and other members of the Class will suffer irreparable harm unless the actions of these Defendants are enjoined and a fair process is substituted.

93.     By the acts, transactions and courses of conduct alleged herein in connection with the Proposed Transaction, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the Class and have breached their duties of candor, loyalty, entire fairness, good faith, and care by not taking adequate measures to ensure that the interest of CSST's public shareholders are properly protected from over-reaching by Defendant Tu.

94.     The Individual Defendants, acting in concert, have and continue to violate their fiduciary duties owed to the public shareholders of CSST, have put their own personal interests ahead of the interests of the CSST public shareholders, and have used their control positions as officers and directors of CSST for the purpose of reaping personal gain for Board members at the expense of CSST's public shareholders.

95.     The Individual Defendants failed to: (1) undertake an adequate evaluation of CSST's worth as a potential merger/acquisition candidate; (2) take adequate steps to enhance CSST's value and/or attractiveness as a merger/acquisition candidate; (3)

effectively expose CSST to the marketplace in an effort to create an active and open auction for CSST; and (4) act independently so that the interests of public shareholders would be protected.  Instead, the Individual Defendants have allowed Defendant Tu to set an acquisition price for the shares of CSST stock that does not reflect the true value of CSST and without an appropriate premium.

96.     As a result of the actions of the Defendants, Plaintiff and the Class have been, and will be, irreparably harmed in that they have not, and will not, receive their fair compensation for CSST's stock and business, and will be prevented from obtaining a fair price for their shares.

97.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class and may consummate the Proposed Transaction to the disadvantage of the public shareholders of CSST, without providing sufficient information to enable CSST's public shareholders to decide whether to vote for approval of the Proposed Transaction.

98.     As demonstrated by the allegations above, the Individual Defendants have breached their duties of care, loyalty, candor, good faith, and independence owed to Plaintiff and the public shareholders of CSST because, among other reasons, they have failed to take steps to maximize the value of CSST to its public shareholders and/or are attempting to improperly put their personal interests ahead of the interests of CSST shareholders.

99.     Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, all to the irreparable harm

of Plaintiff and the Class, for which Plaintiff and the other members of the Class have no adequate remedy at law.

## COUNT IV

**Claims against CSST, Parent, Merger Sub, and Defendants Tu an Yap
For Aiding and Abetting the Individual Defendants' Violations of Section 14(e) of the
Exchange Act and Breaches of Fiduciary Duties**

100.    Plaintiff incorporates by reference the prior allegations set forth above as if fully set forth herein.

101.    The Individual Defendants violated Section 14(e) of the Exchange Act and breached their fiduciary Duties owed to CSST shareholders by their actions alleged above.

102.    Defendants CSST, Parent, Merger Sub and, at times, Individual Defendants Tu and Yap knowingly aided and abetted the breaches of fiduciary duties committed by the Individual Defendants to the detriment of Plaintiff and CSST public shareholders.  The above-mentioned Defendants have acted and continue to act with knowledge or with reckless disregard to the fact that the Individual Defendants are in breach of their fiduciary duties.  The Proposed Transaction could not and would not take place without the active aiding and abetting of the above-mentioned Defendants.

103.    Unless enjoined by this Court, said Defendants will continue to aid and abet the Individual Defendants' breaches of their fiduciary duties owed to Plaintiff and the Class and their irreparable harm, for which Plaintiff and the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and preliminary and permanent relief, including injunctive relief, in his favor and in the favor of the Class, and against the

Defendants as follows:

A.  Declaring this action to be a proper class action and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel;

B.  Declaring that the Individual Defendants have violated Sections 14(e) and 20(a) of the Securities Exchange Act of 1934 and have breached their fiduciary duties to Plaintiff and the Class;

C.  Declaring that the conduct of the Individual Defendants in approving the Proposed Transaction are breaches of the Individual Defendants' fiduciary duties;

D.  Declaring that Defendants CSST, Parent, Merger Sub and Individual Defendants Tu and Yap have aided and abetted in the breach of fiduciary duties committed by the Individual Defendants;

E.  Declaring that the Proposed Transaction is unfair, unjust and inequitable to Plaintiff and the other members of the Class;

F.  Preliminarily and permanently enjoining all named Defendants and all those acting in concert with them from consummating the Proposed Transaction at a price that is not fair and equitable, until such time that the Individual Defendants have adequately undertaken all appropriate and available methods to maximize shareholder value;

G.  In the event the Proposed Transaction is consummated, rescinding it or awarding actual and punitive damages to Plaintiff and the Class, together with prejudgment and post judgment interest;

H.  Awarding fees, costs and expenses to Plaintiff incurred in connection with this litigation, including reasonable attorneys' and experts' fees; and

I.     Granting such other and further relief as may be just and proper.

Dated: July 21, 2011

O'KELLY & ERNST, LLC

*/s/ Ryan M. Ernst*
Ryan M. Ernst (#4788)
The Brandywine Building
1000 N. West Street, Suite 1200
Wilmington, DE 19801
302-295-4905
302-295-2873 (fax)
rernst@oelegal.com

*Attorneys for Plaintiff*

*Of Counsel:*

**WEISS & LURIE**
Joseph H. Weiss
Richard A. Acocelli
Joshua M. Rubin
1500 Broadway
16th Floor
New York, NY 10036
(212) 682-3025